UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| STEPHEN BLESSING, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-1294-RLY-TAB |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| CORRECTION, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Stephen Blessing ("Plaintiff"), brought the present action against his former employer, Indiana Department of Correction ("Defendant"), alleging that Defendant terminated him because of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Defendant now moves for summary judgment on Plaintiff's claim.  For the reasons set forth below, the court **DENIES** Defendant's motion.

**I.      Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When a summary judgment motion is made and

supported by evidence as provided in Rule 56(c), however, the nonmoving party may not

rest on mere allegations or denials in its pleadings but "must set forth specific facts

showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986). Some alleged factual dispute that does not rise to a

genuine issue of material fact will not alone defeat a summary judgment motion. *Id.* at

247–48. In deciding whether a genuine issue of material fact exists, the court views the

evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis.*

*Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

## III.    Statement of Facts

### A.    Background

1.    Plaintiff is a male nurse. (Complaint ¶¶ 9–10).

2.    He was hired as a Charge Nurse at Pendleton Juvenile Correctional Facility

("Pendleton" or the "Facility") in 2003. (Deposition of Stephen Blessing

("Blessing Dep.") at 10–11, Defendant's Ex. 1 and Plaintiff's Ex. A; Declaration

of Gloria Johnson ("Johnson Decl.") at ¶ 5, Defendant's Ex. 2).

3.    Plaintiff's duties as a Charge Nurse included performing assessments of injuries or

medical complaints of students and dispensing medications to students at the

Facility. (Blessing Dep. at 12–13).

4.    Plaintiff's direct supervisor at Pendleton was a woman named Gloria Johnson

("Supervisor Johnson").  (Johnson Decl. at ¶ 5).  Supervisor Johnson interviewed

Plaintiff during his application process.  (Blessing Dep. at 11).

5.      During his tenure with Pendleton, Plaintiff worked the 3:00 p.m. to 11:00 p.m.

shift.  (Blessing Dep. at 14).  He worked primarily with Lynn Bogart ("Nurse

Bogart") and Brenda Fuqua ("Nurse Fuqua"), both women.  (Blessing Dep. at 14).

Plaintiff also worked with another woman, Pam Bastian ("Nurse Bastian"), for a

short time each day, as her shift carried over one hour into Plaintiff's.  (Blessing

Dep. at 15).  Plaintiff's three co-workers, Nurses Bogart, Fuqua, and Bastian, were

all nurses.  (Blessing Dep. at 14–15).

6.      Plaintiff was the only male nursing employee employed by Pendleton since

September 2003.  (Defendant's Response to Interrogatory 7, Plaintiff's Ex. G).

### B.      Conduct Leading to Plaintiff's Suspension

7.      Plaintiff received and signed Defendant's Technology User and Internet

Agreement ("Technology Agreement") in September 2003 and August 2004.

(Technology Agreement, Defendant's Ex. 3).

8.      On July 1, 2005, Supervisor Johnson received two complaints about Plaintiff, one

from Nurse Bogart and one from Attarah Lawrence ("Nurse Lawrence"), another

nurse at the Facility, stating that Plaintiff was not assisting in the care of students

but, rather, was spending time on the computer playing games.  (Johnson Decl. at

¶¶ 6–7).

9.      Supervisor Johnson forwarded these complaints to the superintendent of the

Facility, Jane Burns ("Superintendent Burns") requesting the complaints be investigated.  (Johnson Decl. at ¶ 8).

10.   Superintendent Burns requested that Bill Nelson, an internal affairs investigator at Pendleton, investigate the complaints against Plaintiff.  (Declaration of Bill Nelson ("Nelson Decl.") at ¶¶ 2, 4, Defendant's Ex. 6).

11.   During his investigation, Mr. Nelson interviewed Plaintiff, who admitted playing computer games while at work but denied neglecting his work duties.  (Nelson Decl. at ¶ 5).  Mr. Nelson also reviewed the Technology Agreement, computer site and session exports to determine the amount of time Plaintiff spent on the internet, and the complaints made about Plaintiff by Nurses Bogart and Lawrence.  (Nelson Decl. at ¶¶ 5–7).

12.   Mr. Nelson concluded that the allegations against Plaintiff for violating the Technology Agreement and neglecting his work duties were founded.  (Nelson Decl. at ¶ 8).  Mr. Nelson submitted his conclusions to Superintendent Burns. (Nelson Decl. at ¶ 8).

13.   Superintendent Burns reviewed Mr. Nelson's findings and, based on the information in the investigation file, agreed with his conclusion that Plaintiff had violated the Technology Agreement and neglected his duties.  (Declaration of Jane Burns ("Burns Decl.") at ¶ 5, Defendant's Ex. 5).

14.   On July 28, 2005, Superintendent Burns conducted a pre-deprivation meeting with Plaintiff.  (Burns Decl. at ¶ 6)  During the meeting, Plaintiff admitted to playing

computer games while on duty and being critical of and disagreeing with Supervisor Johnson.  (Burns Decl. at ¶ 6).

15.  During the meeting, Superintendent Burns also addressed an alleged misstatement by Plaintiff that he had 48 hours to see a student under the Health Care Directive. (Termination Letter).  Superintendent Burns alleges that policy actually provides that a nurse only has 24 hours.  (Termination Letter).  Plaintiff responds that the policy in place at the time of the alleged misstatement states that the appropriate time is 48 hours.  (Blessing Dep. at 88).

16.  The notes from the July 28, 2005, meeting mention nothing about Plaintiff's alleged neglect of duty.  (Suspension Letter, Defendant's Ex. 7).  Plaintiff states that the allegation regarding his neglect of duty by failing to help care for a student was later found false and was thus left out of the July 28, 2005, meeting notes. (Blessing Dep. at 85, 90).

17.  As a result of Mr. Nelson's investigation and Plaintiff's admissions during the meeting, Superintendent Burns determined that Plaintiff should serve a five-day unpaid suspension.  (Burns Decl. at ¶ 7).

18.  Plaintiff never served his five-day suspension.  (Burns Decl. at ¶ 9).

19.  Plaintiff observed Nurse Fuqua using the computer for non-work related purposes on more than one occasion.  (Blessing Dep. at 95).  She received a letter of reprimand for her misuse of the computer.  (Fuqua Letter of Reprimand, Plaintiff's Ex. J).

20. Plaintiff observed Nurse Bastian using the computer to do work for her master's degree in nursing on several occasions. (Blessing Dep. at 97). Supervisor Johnson was present when Nurse Bastian was using the computer for non-work related purposes. (Blessing Dep. at 100). She was never investigated or disciplined for misusing the computer. (Defendant's Response to Interrogatory 6).

21. Supervisor Johnson instructed Plaintiff to warn Nurse Bogart about writing extensive emails on the computer, as it was inappropriate. (Blessing Dep. at 101–02). However, Plaintiff never spoke with Nurse Bogart. (Blessing Dep. at 102).

22. Plaintiff never received any warning, letter of reprimand, or any other lesser disciplinary action before he received his suspension. (Blessing Dep. at 101).

### C.     Conduct Leading to Plaintiff's Termination

23. Haldol is an anti-psychotic drug used for different psychotic conditions to help calm a person down. (Blessing Dep. at 63).

24. The precise dose of liquid Haldol prescribed must be administered to the patient to avoid possible negative side effects. (Johnson Decl. at ¶ 14).

25. In June or July 2005, Student C.S. was prescribed liquid Haldol concentrate. (Johnson Decl. at ¶ 13).

26. The bottle of liquid Haldol came with an eye dropper or bulb syringe attached to the lid of the bottle to measure the dosage. (Johnson Decl. at ¶ 16). The smallest measurement on this bulb syringe was 1.0 mg. (Nelson Decl. at ¶ 12).

6

27.    Student C.S. was prescribed 0.25 mg of liquid Haldol.  (Nelson Decl. at ¶ 12).
       This dosage was not measured on the bulb syringe that came with the bottle of
       Haldol.  (Blessing Dep. at 66).

28.    Plaintiff calibrated the bulb syringe that came with the liquid Haldol to measure
       the dosage Student C.S. was to receive.  (Blessing Dep. at 66).  Plaintiff measured
       between the lines delineated on the syringe with a standard ruler and using a
       marker, marked half-way between those lines.  (Blessing Dep. at 67).  He then
       tested the measurement by filling a standard syringe and visually comparing it with
       the line on the bulb syringe to make sure the amounts were the same.  (Blessing
       Dep. at 67–68).

29.    Dosages of liquid medication, such as the Haldol, were administered to students
       via a plastic pill cup.  (Blessing Dep. at 151).  The proper dosage of medication
       was measured by a syringe (or whatever dispenser was used for measurement) and
       then placed into the plastic pill cup for the student to ingest.  (Blessing Dep. at
       151–52).

30.    Defendant does not have any written policies that prohibit the measurement of
       medications via the method Plaintiff used when administering Haldol to Student
       C.S.  (Defendant's Interrogatory Response No. 12).

31.    Tylenol was the only other drug that used a bulb syringe.  (Blessing Dep. at 68).
       As with the Haldol, Plaintiff used a ruler to mark the correct dosage on the bulb
       syringe that came with the bottle of Tylenol.  (Blessing Dep. at 68).

32.     Student C.S. was administered Haldol from July 18 through July 26, 2005, once a

day on July 18 and 26 and twice a day July 19–25, 2005.  (Student C.S. Chart).

Five female nurses, along with Plaintiff, administered the Haldol to Student

C.S.—Lynn Bogart, Georgia Tate, Angel Hackman, A. Lawrence, and Judy

Taylor.  (Blessing Dep. at 78–81).

33.     Plaintiff administered the Haldol to Student C.S. using the bulb syringe on July 18,

19, 20, and 26, 2005.  (Blessing Dep. at 78, 80; Nelson Decl. at ¶ 16; Student C.S.

Chart, Ex. F to Nelson Decl.).

34.     On July 22, 2005, Supervisor Johnson learned from Nurse Lawrence that a nurse

had marked the Haldol bulb syringe with a marker and was using that to administer

the Haldol.  (Johnson Decl. at ¶ 17).  Supervisor Johnson told Nurse Lawrence to

place a TB syringe in the box that would accurately measure the proper dosage of

Haldol and put a note with the syringe stating that Haldol was to be measured

using an accurate measuring device.  (Johnson Decl. at ¶ 17).

35.     Nurse Lawrence placed the note with the Haldol and rubber-banded the TB syringe

to the Haldol box on July 22, 2005.  (Declaration of Attarah Lawrence ("Lawrence

Decl.") at ¶ 5, Defendant's Ex. 8).

36.     Plaintiff alleges that the note was not on the Haldol box at any time he

administered the medication.  (Blessing Dep. at 108).

37.     Syringes were disposable and staff members were supposed to get a new syringe

each time they administered a medication.  (Blessing Dep. at 73–74).  Only one

disposable syringe was ever checked out for Student C.S.  (Disposable Syringe Log Sheet, Plaintiff's Ex. D).

38.     On July 28, 2005, Superintendent Burns instructed Mr. Nelson to conduct an investigation into allegations that a bulb syringe was altered and that Plaintiff was administering Haldol to Student C.S. without measuring the proper dosage.  (Burns Decl. at ¶ 16).

39.     During his investigation, Mr. Nelson learned that the Haldol was to be measured by a syringe, not a bulb dropper, and that the other nurses who administered Haldol to Student C.S., all of whom Mr. Nelson interviewed, used the syringe. (Nelson Decl. at ¶¶ 11, 17).[1]  Plaintiff admitted during the investigation that he used the dropper that came with the Haldol and marked the correct measurement on the dropper with a marker.  (Nelson Decl. at ¶ 12).

40.     Mr. Nelson tested Plaintiff's method of measuring the Haldol and discovered that the amount alleged to be 0.25 mg on the dropper was actually 0.20 mg.  (Nelson Decl. at ¶ 13).

41.     Mr. Nelson's investigation concluded that the allegations against Plaintiff of insubordinate conduct, acts of incompetence, and dereliction of duty were founded.  (Nelson Decl. at ¶ 18).

---

[1] Plaintiff objects to this statement by Mr. Nelson, arguing that it is inadmissible hearsay—out of court statements by the nurses offered to prove the truth of the matter asserted. However, this statement is not hearsay.  It is not being used to prove that, in fact, each of the nurses only administered Haldol using the syringe.  *See* FED. R. EVID. 801(c).  Rather, it is being used to demonstrate the facts on which Mr. Nelson relied in his investigation.

42.     On August 1, 2005, Superintendent Burns received Mr. Nelson's investigation file, which revealed that Plaintiff had altered the bulb syringe and was giving Student C.S. an incorrect dosage of Haldol.  (Burns Decl. at ¶ 17).

43.     On August 1, 2005, Superintendent Burns conducted a pre-deprivation meeting with Plaintiff to discuss the findings of Mr. Nelson's investigation.  (Burns Decl. at ¶ 18).

44.     During the meeting, Plaintiff admitted to marking the Haldol dropper to indicate where the measurement of 0.25 mg should be.  (Burns Decl. at 19).

45.     Based upon Mr. Nelson's investigation report and Plaintiff's admission during the meeting, Superintendent Burns determined that Plaintiff's conduct warranted termination.  (Burns Decl. at ¶ 20).

46.     Superintendent Burns concluded that Plaintiff had violated Defendant's "Information and Standards of Conduct" by engaging in insubordinate conduct, dereliction of duty, conduct unbecoming staff, and acts of incompetence. (Termination Letter, Defendant's Ex. 9).  Specifically, Superintendent Burns stated:  "You have defied the order of the Nurse Supervisor to measure the dosage of Haldol (a major tranquilizer for psychotic disorders) into the syringe causing the student to receive the incorrect dosage as ordered by the Psychiatrist." (Termination Letter).

47.     Superintendent Burns issued Plaintiff a thirty-day suspension pending termination on August 4, 2005.  (Burns Decl. at ¶ 19; Complaint ¶ 13).

48.     Plaintiff filed a merit employee complaint regarding his termination, and as a

result, his termination was converted to a resignation.  (Blessing Dep. at 126–28).

## IV.   Discussion

The court now turns to the merits of Plaintiff's sex discrimination claim.  A claim

of unlawful discrimination under Title VII may be proved directly through evidence of an

impermissible motive or indirectly using the *McDonnell Douglas* burden-shifting method.

*Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).  Plaintiff in

the present case proceeds under the indirect method.

Under the indirect method, plaintiff must first establish the four elements of his

prima facie case: (1) he is a member of a protected class; (2) he was meeting his

employer's legitimate job expectations; (3) he was subject to an adverse employment

action; and (4) similarly-situated individuals outside of plaintiff's protected class were

treated differently.  *Id.*  If plaintiff establishes the four elements of his prima facie case,

the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for

its adverse employment action.  *Id.*  Once the employer provides such a reason, "plaintiff

must present sufficient evidence to create a triable issue concerning whether this

justification is pretextual.  *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).

### A.     Prima Facie Case

#### 1.     Member of a Protected Class

Defendant first asserts Plaintiff cannot establish he was a member of a protected

class in this reverse discrimination case.  Where a male plaintiff seeks to establish a claim

of unlawful discrimination, he must set forth some background circumstances "sufficient to demonstrate that the particular employer has 'reason or inclination to discriminate invidiously against [males]' or evidence that 'there is something "fishy" about the facts at hand.'" *Hague v. Thompson Distr. Co.*, 436 F.3d 816, 821 (7th Cir. 2006) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005)). Background circumstances that may satisfy plaintiff's prima facie case include situations (1) "where the men running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity' to increase the proportion of women in the company's workforce" and (2) "where the jobs in question are traditional 'women's work,' such as nursing, which the men running the company believe women can do better than men." *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005); *see also Hague*, 436 F.3d at 822 n.5. A plaintiff may also show the required background circumstances by demonstrating that his case is like a typical discrimination case. *See Hague*, 436 F.3d at 822 (finding that white plaintiffs had sufficiently established the background circumstances of the modified *McDonnell Douglas* test where their black supervisor fired them and hired black replacements).

The facts here make this case seem more like a traditional sex discrimination case than a reverse discrimination case. Plaintiff is male; his former supervisor is female; the superintendent of the facility, and the decision-maker, is female; all the nurses with whom Plaintiff worked are female; and all the nursing employees currently employed at Pendleton are female. These circumstances, in and of themselves, may be sufficient to

establish the "background circumstances" necessary to establish the first element of a

reverse discrimination case.  In addition to these circumstances, Plaintiff was employed as

a nurse, a job that the Seventh Circuit has directly referred to as traditional "women's

work" that satisfies one of the examples of background circumstances a plaintiff must

show to establish reverse discrimination. *Preston*, 397 F.3d at 542.  For these reasons, the

court finds that Plaintiff has shown sufficient background circumstances to establish the

first prong of his prima facie case.

### 2.    Met Legitimate Job Expectations

The second prong of Plaintiff's prima facie case requires him to show that he was

meeting his employer's legitimate job expectations.  Defendant argues that Plaintiff

cannot establish this prong because, although his conduct had been adequate prior to June

2005, the conduct leading to his suspension in July 2005 and termination in August 2005

show he was not meeting his legitimate job expectations.  Because the circumstances of

Plaintiff's termination dovetail with the issue of pretext, the court will discuss that

conduct in its pretext analysis below.  *See Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th

Cir. 2001).

Turning to the conduct leading to Plaintiff's suspension, Defendant first asserts

that Plaintiff violated the computer policy by playing computer games while on duty.

However, the undisputed evidence indicates that Plaintiff's female co-workers also used

the computer for non-work activities but received only minor discipline, if any.  Nurse

Fuqua was observed using the computer for non-work related purposes and received a

letter of reprimand.  Supervisor Johnson learned that Nurse Bogart was writing extensive emails while on duty, and Supervisor Johnson merely told Plaintiff to warn Nurse Bogart that such conduct was inappropriate.  Nurse Bastian was using the computer to do school work in the presence of Supervisor Johnson, yet she never received any discipline.  Based upon this inconsistent enforcement of its computer policy, a rational jury could conclude that Plaintiff playing computer games at work was not a failure to meet Defendant's legitimate job expectations.

Defendant next argues that Plaintiff's suspension was due to his neglect of duty relating to an incident where he failed to help care for a student because he was on the computer.  However, Plaintiff testified in his deposition that those allegations were false, and this allegation was not addressed as a reason for his suspension in the July 28, 2005, letter.  Consequently, it is unclear this alleged conduct factored into Defendant's decision to suspend Plaintiff.  In the light most favorable to Plaintiff, this evidence cannot defeat Plaintiff's assertion that he met Defendant's legitimate job expectations.

Defendant next points to Plaintiff's misstatement of the Health Care Directive as evidence of his failure to meet legitimate job expectations.  Neither the facts surrounding this alleged misstatement nor the content of the policy in place at the time of Plaintiff's alleged misstatement are in evidence.  The court is left with Plaintiff's assertion that he did not misstate the policy against Defendant's assertion that he did.  At this stage, the court must favor Plaintiff's assertion of the facts.  Plaintiff's alleged misstatement of the Health Care Directive thus fails to show Plaintiff was not meeting Defendant's legitimate

job expectations.

Defendant last argues that Plaintiff fails to show he met Defendant's legitimate job expectations because Plaintiff disagreed with and was critical of his supervisor, as referenced in Plaintiff's termination letter.  However, there is no evidence surrounding the circumstances of this disagreement.  Without more, the court cannot say this bare assertion demonstrates that Plaintiff failed to meet Defendant's legitimate job expectations.  For these reasons, the court finds Plaintiff has established that he met Defendant's legitimate job expectations.

The court may dispense with any discussion of the third prong of Plaintiff's prima facie case, as the parties do not dispute that Plaintiff's termination is the only adverse employment action in this case.  Therefore, the court turns to the fourth and final element of Plaintiff's prima facie case.

### 3.      Similarly-Situated Individuals

In order to be similarly situated, employees must be directly comparable in all material respects, including their performance, qualifications, and conduct.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  "This normally entails a showing that the . . . employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue*, 219 F.3d at 617–18 (7th Cir. 2000).  This inquiry is fact sensitive and requires a consideration of the

15

circumstances as a whole.  *Raymond*, 442 F.3d at 610.

In this case, Plaintiff asserts that Nurse Bastian, Nurse Fuqua, and Nurse Bogart were all similarly situated to him.  Defendant does not dispute that these three female nurses were all supervised by Supervisor Johnson, Plaintiff's supervisor, or that they had similar education and experience as Plaintiff.  Rather, Defendant argues that Plaintiff's conduct which led to his suspension and the conduct which led to his ultimate termination distinguish him from the other female nurses.  The discussion of the conduct leading to Plaintiff's termination dovetails on the court's pretext analysis and will be addressed below.  The conduct surrounding Plaintiff's suspension, as set forth above, is in dispute. Drawing inferences in favor of Plaintiff, such conduct cannot act to differentiate Plaintiff from his otherwise similarly-situated co-workers.

Based on the foregoing analysis, the court finds that Plaintiff has met his burden to establish his prima facie case.  The burden now shifts to Defendant to set forth a legitimate, non-discriminatory reason for Plaintiff's termination.  Defendant here asserts that Plaintiff was terminated because he disobeyed Supervisor Johnson's instruction to dispense Haldol to Student C.S. using a syringe, which resulted in Student C.S. receiving the wrong dosage of Haldol.  Plaintiff does not dispute that this qualifies as a legitimate, non-discriminatory reason for his termination.  Rather, Plaintiff argues that this reason is pretextual.  Therefore, the court will turn directly to the pretext analysis.

**B.    Pretext**

"To show pretext, [the employee] must identify such weaknesses, implausibilities,

16

inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007).  If the employer honestly believes the reasons for terminating the employee, no matter how foolish, trivial, or baseless, then the employee cannot meet his burden to show those reasons are pretextual. *Id.*  Where, however, the employee casts doubt on the employer's reasons for his dismissal, the ultimate question of whether the employee was terminated as a result of unlawful discrimination is for a jury. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997).

Defendant sets forth in Plaintiff's termination letter, which reflects the notes of the August 1, 2005, pre-deprivation meeting, the following in regards to Plaintiff's termination:

> During our meeting, you admitted that you did mark the dropper with a marker by using a ruler to indicate, "Where the .25 would be."
>
> The allegations against you have been substantiated.  You have defied the order of the Nurse Supervisor to measure the dosage of Haldol (a major tranquilizer for psychotic disorders) into the syringe causing the student to receive the incorrect dosage as ordered by the Psychiatrist.  Your actions cause me great concern.  In fact, I believe that dispensing medication in the incorrect amount as prescribed by a physician, is detrimental to the student. This certainly cannot be allowed.

(Termination Letter).  This letter demonstrates that Plaintiff was terminated both for using the bulb dropper to administer Haldol to Student, C.S., which resulted in the student receiving an improper dosage of the medication, and for defying Supervisor Johnson's

instruction to use a syringe to administer the Haldol.

Plaintiff argues that the first reason is pretextual because Supervisor Johnson did not instruct the nurses to use a syringe to dispense the Haldol until July 22, 2005, and consistent with that order a disposable syringe was checked-out for Student C.S., as evidenced by the syringe log sheet. However, that is the only day that a syringe was ever checked out for Student C.S. Before July 22, 2005, therefore, a jury could infer that all the nurses dispensing Student C.S.'s medication used the bulb dropper. Further, a jury could infer that after July 22, 2005, nurses either continued to use the bulb dropper, since no additional syringes were checked-out, or a jury could infer that all the nurses dispensing the medication used the same syringe to dispense the Haldol, which violated the disposable syringe policy. Considering these facts in the light most favorable to Plaintiff, there is evidence that other nurses, in addition to Plaintiff, dispensed Haldol using the bulb dropper and thus dispensed the incorrect dosage. However, Plaintiff was the only nurse ever investigated and disciplined for this practice. Due to these inconsistencies, a jury could infer that Defendant's first stated reason for Plaintiff's termination was pretextual.

With respect to Defendant's second reason, that Plaintiff disobeyed Supervisor Johnson's instruction, Plaintiff testified that he never received instructions to use the syringe to administer Student C.S.'s Haldol. The only instruction Nurse Johnson gave with respect to administering the Haldol was to have another nurse, Nurse Lawrence, write a note stating that a syringe was to be used to dispense the Haldol and put that note,

18

along with a syringe, on the box.  However, Plaintiff states that he never saw the note.  At this stage, the court must consider this fact as true.  A jury could infer from these circumstances that Defendant's second reason was pretextual because Plaintiff was terminated for disobeying an order of which he had no notice or knowledge.

The court finds that Plaintiff has met his burden to create a triable issue of fact on whether Defendant's reasons for terminating him were pretextual and thus denies Defendant's motion for summary judgment.

## V.      Conclusion

Based upon the foregoing analysis, Defendant's motion for summary judgment (Docket # 20) is **DENIED**.


**SO ORDERED** this 27th day of March 2008.

 

 

 

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

John H. Haskin
HASKIN LAUTER  & LARUE
jhaskin@hlllaw.com

Betsy M. Isenberg
INDIANA STATE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Kathryn Lynn Morgan
INDIANA STATE ATTORNEY GENERAL
Kathryn.Morgan@atg.in.gov

Christopher S. Wolcott
HASKIN LAUTER  & LARUE
cwolcott@hlllaw.com